The Honorable Tiffany M. Cartwright

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

C.F. by and through his parent, ERICA DRIGGERS, W.M. by and through his parent, DESIREE PRESNELL, O.S. by and through his parent, LINDSEY TOPPING-SCHUETZ, J.P. by and through his parent, JESSICA MORROW, W.J. by and through his parent, DESIREE PRESNELL, individually and on behalf of a class,

Plaintiffs,

v.

RYAN MORAN, in his official capacity as Director of the Washington State Health Care Authority,

Defendant.

NO.  3:26-cv-05095-TMC

RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

The plaintiffs seek the rare issuance of a mandatory preliminary injunction when they lack a right of action to pursue their Medicaid claims and, in any event, have failed to prove those claims or their allegation under the Americans with Disabilities Act ("ADA").

The plaintiffs ask the Court to compel the Washington State Health Care Authority ("HCA") to fundamentally alter its Medicaid program to pay parents for providing in-home care

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO.  3:26-CV-05095-TMC

1

for their children. The Court should deny the Motion for Preliminary Injunction ("Motion") [Dkt. #18] for the following reasons:

1.      The plaintiffs are not likely to succeed on the merits of their Medicaid claims.

(a)      The plaintiffs do not have a private right of action under 42 U.S.C. § 1983 to pursue the claims, under the framework articulated in *Medina v. Planned Parenthood South Atlantic*, 606 U.S. 357 (2025). Neither statute cited by the plaintiffs contains the rights-creating language that is needed to support a Section 1983 action.

(b)      In accordance with *Medina*, the appropriate enforcement authority for HCA's alleged errors is the federal Medicaid agency, not a private lawsuit.

(c)      HCA has continually provided "medical assistance" to the plaintiffs under 42 U.S.C. §§ 1396a(a) and 1396d(a). There is no evidence that HCA or its partners have not authorized in-home nursing or personal care services, that HCA is failing to continue to seek to provide medically necessary services, or that the services provided are inappropriate.

(d)      HCA has provided medical assistance with "reasonable promptness" under 42 U.S.C. § 1396a(a)(8). The plaintiffs have received services appropriate to their factual and medical situations.

(e)      HCA has complied with Medicaid's Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") requirements by ensuring the plaintiffs receive medically necessary services.

2.      The plaintiffs are not likely to succeed on the merits of their claims under the ADA and Section 504 of the Rehabilitation Act of 1973. The plaintiffs are receiving care in the most integrated setting appropriate to their needs. The plaintiffs do not assert they are institutionalized and have not shown they are at risk of institutionalization. Also, their proposed remedy would fundamentally alter the program, which the ADA does not require.

///

///

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO.  3:26-CV-05095-TMC

2

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
360-586-6565

3.      The plaintiffs have not proven they are likely to suffer irreparable harm in the absence of an injunction, because there is no evidence they will lose their services or that they are at risk of institutionalization.

4.      The balance of equities and the public interest do not tip in the plaintiffs' favor, because HCA is complying with applicable law and continues to work with the plaintiffs to ensure the provision of services. HCA has not denied any services or failed to make efforts to find additional services.

## II.      LEGAL BACKGROUND

### A.      Washington Offers Medicaid Coverage to Low-Income Individuals Under Federal Guidelines

Under the Medicaid program, Congress offers funding to the States to assist them in providing healthcare to low-income individuals. *See generally* 42 U.S.C. § 1396a(a); 42 C.F.R. § 430.0; *Nat'l Fed'n of Indep. Bus., et al., v. Sebelius*, 567 U.S. 519, 541 (2012); *see also* Wash. Rev. § Code 74.09.500. The original version enacted in 1965 is called "Classic Medicaid," and amendments in 2010 are called "Medicaid Expansion."

The federal and state governments both provide funding and determine program parameters. *See* 42 C.F.R. § 430.0; *Douglas v. Indep. Living Ctr. of So. Cal., Inc.*, 565 U.S. 606, 610 (2012). Under federal guidelines, states determine eligibility, benefits, and payment rates. *See* 42 C.F.R. § 430.0; *Rite Aid of Pa., Inc. v. Houstoun*, 171 F.3d 842, 845 (3d Cir. 1999). The responsible federal agency is the Centers for Medicare and Medicaid Services ("CMS"), within the Department of Health and Human Services. *Indep. Living*, 565 U.S. at 610.

### B.      Washington Receives Federal Matching Funds with CMS Oversight

The State must comply with Medicaid law in order to receive federal funding. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 323 (2015). One requirement is to submit a "State Plan" to CMS describing how HCA will administer Medicaid and assure compliance with federal law. *See* 42 U.S.C. § 1396a(a); 42 C.F.R. § 430.12; *Indep. Living*, 565 U.S. at 610. The State

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO.  3:26-CV-05095-TMC

3

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
360-586-6565

Plan "must satisfy more than 80 separate conditions Congress has set out in" 42 U.S.C. § 1396a(a). *Medina*, 606 U.S. at 363; *see also* 42 C.F.R. §§ 430.10, 430.14. Federal matching funds are available if CMS approves the State Plan. *See generally* 42 U.S.C. § 1396b(a); 42 C.F.R. §§ 430.1, 447.304(c); *Medina*, 606 U.S. at 363.

CMS closely oversees HCA's expenditures and wields a considerable financial stick, because it can withhold funding if it concludes the State is violating federal requirements. *See, e.g.,* 42 U.S.C. § 1396c; 42 C.F.R. § 430.35(a); *Medina*, 606 U.S. at 362, 364. This can be significant, because CMS funds at least 50% of expenditures for Classic Medicaid and 90% for Medicaid Expansion. *See* 42 U.S.C. § 1396b(a)(1); *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 584.

## C.    HCA Is Washington's Medicaid Agency

The Legislature designated HCA as Washington's "single State agency" for Medicaid. *See* Wash. Rev. Code §§ 41.05.021(1)(m)(i); 74.04.050; 74.09.530(1)(a). This stems from a federal requirement for the State Plan. *See* 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10(b)(1); *San Lazaro Ass'n, Inc. v. Connell*, 286 F.3d 1088, 1092 (9th Cir. 2002). HCA is answerable to CMS for all aspects of the program. *San Lazaro*, 286 F.3d at 1099-1100.

HCA must take all steps necessary to ensure the receipt of federal funds. *See* Wash. Rev. Code §§ 74.04.050(3); 74.09.500. HCA partners with the Department of Social and Health Services ("DSHS") to oversee services for aging and disabled clients. *See* Wash. Rev. Code §§ 41.05.021(1)(m)(iii); 43.20A.865; 74.09.530(1)(d); Declaration of Colette Jones dated March 17, 2026 ("Jones Decl."), ¶¶ 34, 35.

## D.    Medicaid Clients Can Receive Healthcare Through Two Systems

Medicaid clients can receive benefits through a "fee-for-service" system or a "managed care" system. *G. v. Haw. Dep't of Human Servs.*, 703 F. Supp. 2d 1078, 1084 (D. Haw. 2010); *St. John Medical Ctr. v. Dep't of Social and Health Serv.*, 110 Wash. App. 51, 56, 38 P.3d 383 (2002). This case involves both.

///

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO.  3:26-CV-05095-TMC

4

Under fee-for-service, "the state contracts directly with and pays healthcare providers . . . for services they provide to Medicaid beneficiaries." *Haw. Dep't of Human Servs.*, 703 F. Supp. 2d at 1084. Under managed care, the state enters into contracts with managed care organizations ("MCOs") that furnish services "through their own employees or by contracting with independent providers[.]" *Id.*

In Washington, most Medicaid clients receive healthcare through MCOs. *See* Wash. Rev. Code §§ 74.09.522(2), (6); Jones Decl. ¶ 4. HCA pays a monthly premium to the MCOs for each enrolled client, and the MCOs ensure the provision of healthcare. *See* Wash. Admin. Code §§ 182-538-067(1) (2020), -070(1) (2024); *St. John*, 110 Wash. App. at 56. The MCOs' provider networks must be adequate to meet the needs of their clients. *See* 42 U.S.C. § 1396u-2(b)(5); 42 C.F.R. § 438.207(b)(2); Wash. Rev. Code § 74.09.522(11); Wash. Admin. Code § 182-538-067(1)(c) (2020).

**E.    Medicaid Covers a Variety of Benefits, Including Private Duty Nursing and Personal Care**

Certain medical services are "mandatory" under federal law and therefore must be offered to Medicaid clients. *See* 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a); 42 C.F.R. §§ 440.210(a), 440.220(a). All other services are "optional." *See* 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(12); 42 C.F.R. §§ 440.120, 440.210(a)(1), 440.225.

One service at issue here is known as private duty nursing ("PDN") or in-home nursing. *See* Jones Decl. ¶¶ 6-8; Declaration of Kaila O'Dell dated March 13, 2026 ("O'Dell Decl."), ¶ 2. PDN is generally an optional service, since it is not listed as mandatory. *See* 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(8). But in Washington, PDN is a covered service for all Medicaid clients. *See* Wash. Rev. Code § 74.09.520(1)(h); Wash. Admin. Code §§ 182-501-0060(6) (2023), 182-538-095(1) (2020); O'Dell Decl. ¶ 2.

PDN services are voluntary; each client chooses whether to use them, which nurses to use, and which hours to use them. *See* Jones Decl. ¶ 27. The applicability of PDN depends on

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO.  3:26-CV-05095-TMC

5

the condition of each client. *See* Jones Decl. ¶ 14. The client's physician determines medical necessity, and the MCO (if applicable) decides whether to grant "prior authorization." *See* Jones Decl. ¶ 13. The MCOs contract with home health agencies to provide PDN. *See* Jones Decl. ¶ 15. The client and the family choose the agency. *See* Jones Decl. ¶ 16.

Another service at issue here is called "personal care," which covers in-home medical care under DSHS's Community First Choice ("CFC") program.[1] *See* 42 U.S.C. § 1396n(k); 42 C.F.R. Part 441, Subpart K; Wash. Rev. Code § 74.39A.400(1); Wash. Admin. Code § 388-106-0270 (2023); Jones Decl. ¶ 35; Declaration of Melissa Randles-Mehammed dated March 19, 2026 ("Randles Decl."), ¶ 5.

The program provides support to clients living outside of institutions. *See* Wash. Admin. Code § 388-106-0270 (2023); Randles Decl. ¶ 6. Personal care means physical assistance with activities of daily living (ADLs) and instrumental ADLs such as bathing, toileting, eating, meal preparation, housework, and essential shopping. *See* Wash. Admin. Code § 388-106-0010 (2026); Randles Decl. ¶¶ 6-7, 9.

To provide CFC, the State had a choice of two different "service models." *See* 42 C.F.R. § 441.545. The State chose the "agency-provider" model. *See* 42 C.F.R. § 441.545(a), (b); Washington State Plan, Attachment 3.1-K, p. 2. This means that CFC provides services through contracts with agencies or individuals. *See* 42 C.F.R. § 441.545(a)(1).

In turn, DSHS entered into contracts with agencies such as Consumer Direct Care Network of Washington ("CDWA") to facilitate delivering CFC services. *See* Randles Decl. ¶ 21; *see also* Wash. Rev. Code § 74.39A.500(1), (2).[2] CDWA employs about 59,000 Individual Providers ("IPs") who furnish the services. *See* Randles Decl. ¶¶ 21, 29. The clients "maintain the ability to have a significant role" in the choice of provider. *See* 42 C.F.R. § 441.545(a)(2); *see also* Wash. Rev. Code § 74.39A.520; Randles Decl. ¶¶ 23, 27, 30.

---

[1] CFC differs from the traditional form of personal care services. *See* 42 U.S.C. § 1396d(a)(24); 42 C.F.R. § 440.167. A higher percentage of federal matching funds is available under CFC. *See* 42 U.S.C. § 1396n(k)(2).

[2] **Exhibit A** illustrates the interplay of the entities involved in providing services to the plaintiffs.

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO.  3:26-CV-05095-TMC

6

DSHS assesses clients to determine a monthly allotment of hours, and clients may choose to receive services through home care agencies, IPs, or both. *See* Randles Decl. ¶¶ 18-19. Clients work directly with providers to schedule their service hours. *See* Randles Decl. ¶ 18. DSHS does not allow parents and guardians of minors to work as IPs to provide personal care to their minor children. *See* Wash. Admin. Code § 388-115-0540(1)(b) (2024).

Federal Medicaid law also includes a service known as EPSDT. *See* 42 U.S.C. § 1396a(a)(43); Wash. Admin. Code § 182-534-0100 (2025); *Hawai'i Disability Rights Center v. Kishimoto*, 122 F.4th 353, 361 (9th Cir. 2024). Under EPSDT, the State must provide both mandatory and optional Medicaid services to clients under age 21. *Katie A., ex rel. v. Los Angeles Cnty*, 481 F.3d 1150, 1154 (9th Cir. 2007); *see also* 42 U.S.C. § 1396d(r)(5). Therefore, PDN and in-home personal care for clients under age 21 are mandatory.

## F.    The ADA and the Rehabilitation Act of 1973

The ADA and Section 504 of the Rehabilitation Act of 1973 are intended to eliminate discrimination against individuals with disabilities. *See* 42 U.S.C. § 12101(b)(1); *Kishimoto*, 122 F.4th at 361. Courts "generally interpret" these laws "as providing the same protections." *Kishimoto*, 122 F.4th at 361.

Title II of the ADA prohibits governmental discrimination in public services. *See* 42 U.S.C. §§ 12131-12165. In particular, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *See* 42 U.S.C. § 12132.

## III.    FACTUAL BACKGROUND

Each plaintiff (1) is eligible for Medicaid as a "categorically needy" individual; (2) receives the full scope of Medicaid benefits, such as physician services and prescription drugs; and (3) receives in-home nursing care, in-home personal care, or both.
///

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO.  3:26-CV-05095-TMC

7

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
360-586-6565

*See* Jones Decl. ¶ 11. For the latter, each plaintiff has been authorized by an MCO to receive in-home nursing care, authorized by DSHS to receive in-home personal care, or both.[3]

## IV.    THE COURT SHOULD DENY THE MOTION

### A.    Standards for Granting a Preliminary Injunction

The plaintiffs have not satisfied the standards of Fed. R. Civ. P. 65(a). The plaintiffs must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *San Luis Obispo Coastkeeper v. County of San Luis Obispo*, 161 F.4th 590, 598 (2025).

Under the Ninth Circuit's "sliding scale" approach, the Court also may grant an injunction when plaintiffs raise "serious questions going to the merits" and "the balance of hardships tips sharply in [their] favor." *Alliance for Wild Rockies, v. Cottrell*, 632 F.3d 1127, 1134-1135 (9th Cir. 2011). This approach attempts to balance the *Winter* elements "so that a stronger showing of one element may offset a weaker showing of another." *Planned Parenthood Great NW v. Labrador*, 122 F.4th 825, 844 (9th Cir. 2024).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* (citation omitted). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* (citation omitted).

---

[3] *See* Declaration of Darla Bernstein dated March 11, 2026 ("Bernstein Decl."), ¶ 11 (PDN hours for C.F.); Declaration of Collin Elane dated March 17, 2026 ("Elane Decl."), ¶¶ 55-56, 64 (PDN hours for W.M.); Declaration of Rita Birch dated March 16, 2026 ("Birch Decl."), ¶¶ 15, 17 (personal care hours for W.M.); Birch Decl. ¶¶ 6, 10 (personal care hours for W.J.); Declaration of Thomas Moore dated March 13, 2026 ("Moore Decl."), ¶¶ 5-6 (personal care hours for J.P.); Declaration of Christine Welker dated March 17, 2026 ("Welker Decl."), ¶ 3 (personal care hours for J.P.); Declaration of Jennifer Donald dated March 13, 2026 ("Donald Decl."), ¶¶ 5-10 (personal care hours for O.S.); Elane Decl. ¶¶ 16, 22 (PDN hours for O.S.).

The plaintiffs are seeking a mandatory (rather than prohibitory) injunction. *See* Dkt. #18 at p. 7:10-11. "Such injunctions are disfavored." *San Luis Obispo*, 161 F.4th at 597. The requested relief "is subject to heightened scrutiny and should not be issued unless the facts and law clearly favor" the plaintiffs. *Id.* (citation omitted).

**B.    The Plaintiffs Are Not Likely to Prevail on the Merits**

Likelihood of success on the merits is the most important factor, and the Court can bypass the others if a plaintiff fails this threshold inquiry. *California v. Azar II*, 911 F.3d 558, 574 (9th Cir. 2018). For several reasons, the plaintiffs are not likely to succeed on the merits.

**1.    The plaintiffs do not have a right of action under section 1983 to pursue their Medicaid claims**

Plaintiffs assert that 42 U.S.C. § 1983 is an appropriate vehicle to pursue their claims under Medicaid's "reasonable promptness" and EPSDT provisions. *See* Dkt. #1 at p.28:16-17, 29:8-9. Under recent case law, the plaintiffs are incorrect.

The statute provides a right of action for "the deprivation of any *rights, privileges, or immunities*" that are "secured by the Constitution and laws[.]" *See* 42 U.S.C. § 1983 (emphasis added); *Medina*, 606 U.S. at 367-68. However, "federal statutes do not confer rights enforceable under § 1983 as a matter of course." *Medina*, 606 U.S. at 365 (citations and quotations omitted). The right does not extend to alleged deprivations of "benefits or interests." *Medina*, 606 U.S. at 365-66 (citations and quotations omitted).

The right of action occurs only in "atypical" and "rare" situations. *Medina*, 606 U.S. at 368. This is "particularly true of statutes, like Medicaid, enacted pursuant to Congress's spending power." *Medina*, 606 U.S. at 365. "Though it is rare enough for any statute to confer an enforceable right, spending-power statutes like Medicaid are especially unlikely to do so." *Medina*, 606 U.S. at 369; *see also Anderson v. Crouch*, No. 22-1927, 2026 WL 667919, at *33-34 (4th Cir., March 10, 2026) (no private right of action to pursue claims under 42 U.S.C. § 1396a(a)(10)).

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO.  3:26-CV-05095-TMC

9

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
360-586-6565

The Spending Clause "allows Congress to offer funds to States that agree to certain conditions." *Medina*, 606 U.S. at 365. "But when a State violates those conditions, the typical remedy is not a private enforcement suit but rather action by the Federal Government to terminate funds to the State." *Medina*, 606 U.S. at 365-66 (citations and quotations omitted).

To determine if an enforceable right, privilege, or immunity exists, courts employ a "stringent" and "demanding" test that amounts to a "significant hurdle[.]" *Medina*, 606 U.S. at 368, 375 (citations omitted). To prove a statute "does not just provide a benefit or protect an interest, a plaintiff must show that the law in question clearly and unambiguously uses rights-creating terms." *Medina*, 606 U.S. at 368 (citations, quotations, and brackets omitted). The statute "must display an unmistakable focus on individuals like the plaintiff." *Id.* (citations and quotations omitted). "And even for the rare statute that satisfies" the stringent test, an "action still may not be available if Congress has displaced [Section] 1983's general cause of action with a more specific remedy." *Id.*

In finding a right of action in a recent Medicaid case, the Supreme Court emphasized that the statutes at issue referred multiple times to "rights" (and not merely benefits or interests) that nursing facility residents enjoyed. *Medina*, 606 U.S. at 377, 378 (citing *Health and Hospital Corporation of Marion County v. Talevski*, 599 U.S. 166, 181-82 (2023)). The statutory "rights" were "clear and unambiguous[.]" *Medina*, 606 U.S. at 377 (citing *Talevski*, 599 U.S. at 186).

In contrast, the Medicaid statute at issue in *Medina* "look[ed] nothing like" those at issue in *Talevski*. *Id.* The statute at issue in *Medina* requires the State Plan to assure CMS that clients "may obtain" services "from any" provider who is "qualified" and "who undertakes to" furnish the service. *See* 42 U.S.C. § 1396a(a)(23)(A); *Medina*, 606 U.S. at 377. The statute "speaks to what a State must do to participate in Medicaid, and a State that fails to fulfill its duty might lose federal funding." *Medina*, 606 U.S. at 377. But there is no rights-creating language, and so Section 1983 was not available. *Medina*, 606 U.S. at 378-79.

As explained below, the statutes at issue here are akin to the statute at issue in *Medina*.

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO.  3:26-CV-05095-TMC

10

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
360-586-6565

### a.    No right of action exists under reasonable promptness

Adopting the principles of *Medina*, the Tenth Circuit and a District Court in Oregon both held recently that no right of action exists under the reasonable promptness provision. *Lancaster, By and Through Green, v. Cartmell*, 162 F.4th 1063, 1068 (10th Cir. 2025); *Ramirez v. Oregon Health and Science Univ.*, No. 3:24-cv-01470-SB, slip op. at 19 (D. Or. Feb. 9, 2026). The same result should occur here.

As noted, the State Plan must assure CMS that HCA will provide services with "reasonable promptness[.]" *See* 42 U.S.C. § 1396a(a)(8). This provision is "nested within" a list of more than 80 items the State Plan must include. *See* 42 U.S.C. § 1396a(a)(1)–(86); *Lancaster*, 162 F.4th at 1068.

Like reasonable promptness, the statute at issue in *Medina* is within the list of items that the State Plan must include, in particular requiring the state to assure CMS that it will generally allow clients to receive services from their choice of providers. *Medina*, 606 U.S. at 377 (citing 42 U.S.C. § 1396a(a)(23)(A)). The statute "speaks to what a State must do to participate in Medicaid, and a State that fails to fulfill its duty might lose federal funding." *Medina*, 606 U.S. at 377. But there is no rights-creating language. *Medina*, 606 U.S. at 378.

Similarly, reasonable promptness is directed at the approval process for the State Plan and does not include privately enforceable rights. *Lancaster*, 162 F.4th at 1068. The mere fact that a statute contains "mandatory language" does not "create individually enforceable rights." *Lancaster*, 162 F.4th at 1068; *see also Ramirez*, slip op. at 19. (Section 1396a(a)(8) does not "clearly and unambiguously use[] rights-creating terms") (citation omitted).

In addition, CMS can withhold funding if HCA does not comply with the reasonable promptness statute. *Medina*, 606 U.S. at 368. Congress has created "a more specific remedy." *Id.* The plaintiffs lack a right under Section 1983 to pursue this claim.

///

///

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO.  3:26-CV-05095-TMC

11

**b.        No right of action exists under EPSDT**

Like the reasonable promptness and any-willing-provider provisions, the EPSDT requirement is among the assurances that HCA must make in the State Plan, as a condition of receiving federal funding. *See* 42 U.S.C. §§ 1396a(a)(43), 1396b. The State Plan must assure CMS that HCA will inform clients of available services, help arrange screenings and treatments, and provide detailed annual reports to CMS. *See* 42 U.S.C. § 1396a(a)(43); *see also* 42 U.S.C. § 1396d(4)(B) (EPSDT is mandatory); 42 U.S.C. § 1396d(r)(5) (defining services).

The EPSDT statute is not the "atypical" or "rare" situation creating a private right of action. *Medina*, 606 U.S. at 368. The statute does not refer to any "rights, privileges, or immunities[.]" *Medina*, 606 U.S. at 365-66 (citations and quotations omitted). Instead, the statute outlines items that HCA must include in the State Plan in order to get federal funding.

The plaintiffs cannot establish that EPSDT passes the "stringent" and "demanding" test to allow a Section 1983 action. *Medina*, 606 U.S. at 368. The provision does not "clearly and unambiguously use[] rights-creating terms." *Medina*, 606 U.S. at 368 (citations, quotations, and brackets omitted). Given that CMS can withhold funding if HCA does not comply with the State Plan, EPSDT is another provision for which Congress created "a more specific remedy." *Id.*

A recent decision from Hawaii misconstrued *Medina* and held that Section 1983 can be used to enforce EPSDT. *Hawai'i Disability Rights Center v. Kishimoto*, No. 18-00465 LEK-KJM, slip op. (D. Hawai'i Feb. 27, 2026). The decision acknowledged the principles of *Medina* but incorrectly concluded that the EPSDT provisions "constitute a mandatory directive focused squarely on individuals." *Kishimoto*, slip op. at 7.

The Court relied on the fact that states "must" provide services under EPSDT. *Kishimoto*, slip op. at 8. The rationale is flawed because *all* of the more than 80 subsections within 42 U.S.C. § 1396a(a) are introduced by the statute's opening clause specifying what the State Plan "must" provide. Under the Court's rationale, each and every subsection would, ///

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO.  3:26-CV-05095-TMC

12

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
360-586-6565

therefore, be amenable to a Section 1983 lawsuit. The Supreme Court rejected that premise. *Medina*, 606 U.S. at 378-79.

The Court in *Kishimoto* also relied on the word "must" in the reasonable promptness subsection. *Kishimoto*, slip op. at 8. But this analysis conflicts with the more reasoned decisions of *Lancaster* and *Ramirez*, discussed above.

The Court also found it noteworthy that the EPSDT provisions are "individual-centric." *Kishimoto*, slip op. at 9. But so are the any-willing-provider and reasonable promptness provisions, both of which pertain to obtaining healthcare services. The decisions in *Medina*, *Lancaster*, and *Ramirez* supply better reasoning for purposes of Section 1983.

Finally, the Court was swayed by the fact that the purpose of Medicaid is to provide healthcare. *Kishimoto*, slip op. at 8 (citing 42 U.S.C. § 1396-1). Under this sweeping rationale, every Medicaid provision would be enforceable under Section 1983, which *Medina* forecloses.

This Court should adopt the *Medina* principles and hold that Section 1983 cannot be used to enforce EPSDT.

### 2. The federal government has not taken enforcement action against HCA

As noted, CMS reviews and approves the State Plan and periodic amendments. *See* 42 C.F.R. §§ 430.10, 430.14; *Pharm. Rsch. and Mfrs. of America v. Walsh*, 538 U.S. 644, 650 (2003). Washington's State Plan contains PDN and personal care services. *See* Jones Decl. ¶ 8; Randles Decl. ¶ 6.

By approving the State Plan, CMS verified HCA's compliance with Medicaid law. If CMS concluded that HCA was violating the State Plan or Medicaid law, it could withhold funding. *See, e.g.,* 42 U.S.C. § 1396c; 42 C.F.R. § 430.35(a). There is no evidence that the plaintiffs have asked CMS to review the program or that CMS has taken any adverse action.

In addition, the plaintiffs have the right to sue CMS for approving the State Plan. *See, e.g.*, *Managed Pharmacy Care v. Sebelius*, 716 F.3d 1235, 1243 (9th Cir. 2013); *National Ass'n of Chain Drug Stores, et al., v. Becerra*, Case No. 2:21-cv-00576 (W.D. Wash. 2021) (pharmacy

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO.  3:26-CV-05095-TMC

13

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
360-586-6565

groups' challenge to CMS approval of HCA State Plan Amendment). The plaintiffs have taken no such action.

### 3.    The plaintiffs are not likely to prevail on their Medicaid claims

Even if they have a right of action, the plaintiffs have not proven they are likely to succeed on the merits of their EPSDT and reasonable promptness claims. *See* Dkt. #18 at p. 3:1-7, 10:11-15 (EPSDT); Dkt. #18 at p. 3:7-8, 11:19-22 (reasonable promptness).

### a.    HCA is complying with EPSDT

EPSDT covers a range of screening and healthcare services, including any Medicaid benefit that might "correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan." *See* 42 U.S.C. § 1396d(r)(5).

HCA approved each plaintiff for Medicaid as well as PDN, personal care, or both. *See* Jones Decl. ¶ 11. The plaintiffs do not deny they are receiving "medical assistance" under 42 U.S.C. §§ 1396a(a) and 1396d(a). The plaintiffs do not allege that HCA has denied their eligibility for Medicaid, denied coverage for any aspect of the full scope of benefits, denied requests for coverage of PDN or personal care, or refused to work with them to obtain additional services.

There is no evidence that HCA and its partners are failing to seek to obtain all medically necessary services for the plaintiffs or that the services provided are inappropriate. The evidence shows the exceptional steps that HCA and others have taken to help the plaintiffs. *See generally* Bernstein Decl.; Elane Decl.; Birch Decl.; Declaration of Mandy Hegr dated March 17, 2026 ("Hegr Decl."), ¶ 3; Moore Decl. ¶ 4; Welker Decl. ¶ 3; Donald Decl. ¶¶ 3, 11.

### b.    HCA is complying with the reasonable promptness provision

The plaintiffs allege that HCA is failing to provide PDN and personal care services in a reasonably prompt manner. *See* Dkt. #18 at p. 3:7-8, 11:7-22, 12:7-13. As noted, HCA must

///

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO.  3:26-CV-05095-TMC

14

assure CMS in the State Plan that benefits "shall be furnished with reasonable promptness to all eligible individuals[.]" *See* 42 U.S.C. § 1396a(a)(8).

Reasonable promptness does not require HCA to immediately furnish all requested services. Whether services are "provided with reasonable promptness is determined by a test of reasonableness." *C.F. v. Lashway*, No. C16-1205 RSM, 2017 WL 2806835, *3 (W.D. Wash. June 29, 2017) (unpublished) (genuine issue of material fact precluded a finding that plaintiffs were denied reasonably prompt access to services in supported living); *see also Hanley v. Zucker*, No. 15-cv-5958 (KBF), 2016 WL 3963126, *3 (S.D.N.Y. July 21, 2016) (unpublished); CMS guidance letter to states, at 6. [4]

Reasonable promptness is fundamentally a question of fact that involves evaluating each individual's circumstances.[5] The urgency of need, availability of alternative services, and availability of providers are all relevant factors. *Id.* Because PDN and personal care are provided in-home, it is reasonable that it may take longer to arrange providers than for other services, such as hospital or primary care. *See* Jones Decl. ¶¶ 28-31. A family must find a nurse who is the right fit. *See* Jones Decl. ¶ 27. If a nurse is no longer available or cannot cover certain shifts, an agency will need to find a new nurse acceptable to the family. *See* Jones Decl. ¶¶ 27, 31. Similarly, clients who choose to receive personal care must select a provider. *See* Randles Decl. ¶¶ 14-24. Services are voluntary, and clients have a right to choose, fire, or change providers. *See* Randles Decl. ¶ 33. The State cannot force a client to accept a provider.

As described below, the circumstances of each plaintiff highlight the individualized nature of arranging for PDN and personal care.

///

///

///

_____

[4] Letter from CMS to State Medicaid Directors, dated January 10, 2001, *available at* https://downloads.cms.gov/cmsgov/archived-downloads/SMDL/downloads/smd011001a.pdf (last visited March 20, 2026).

[5] *Id.*

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO. 3:26-CV-05095-TMC

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
360-586-6565

### (1)    Plaintiff C.F.

The plaintiffs assert that C.F. has been approved for 16 hours of PDN per day, has received about 37 hours per week in the past 1-1/2 years, and is at risk of institutionalization. *See* Dkt. #18 at p. 4:2-6, 11:7-8, 13:17-20. The allegations do not pertain to personal care.

C.F. is enrolled with UnitedHealthcare Community Plan ("United"), an MCO under contract with HCA. *See* Jones Decl. ¶¶ 5, 12; Bernstein Decl. ¶¶ 4, 5. In contrast to their litigation position, the family has affirmed in each year of C.F.'s enrollment that his "needs [have been] fully met by health insurance benefits[.]" *See* Bernstein Decl. ¶ 24.

C.F. is eligible for 16 hours per day of PDN services. *See* Bernstein Decl. ¶ 10. For more than two years, United paid an agency more than the standard Medicaid rate to ensure the availability of services. *See* Bernstein Decl. ¶ 15. This agency recently stopped working with C.F. because they had difficult staffing, with "mother specifically," and had sent "a good amount of nurses there" and it did not work out for "some reason or another." *See* Bernstein Decl. ¶ 21, Ex. 3 at 8.

United provides case management and care coordination services to C.F., including the facilitation of PDN. *See* Jones Decl. ¶ 10; Bernstein Decl. ¶¶ 7, 9, 22-23. The family always has the choice of a provider, with the case manager offering significant support. *See* Bernstein Decl. ¶¶ 9, 14.

After this litigation began, C.F.'s mother told United that the family could reduce its PDN because of involvement from the school nurse, but the situation changed two weeks later. *See* Bernstein Decl. ¶¶ 16-18. United and its contractors are recruiting now, but they are encountering roadblocks because of issues with C.F.'s family. *See* Bernstein Decl. ¶¶ 20-21.

Three agencies declined to provide services because of previous difficulties with the family, including obscene comments to a nurse. *See* Bernstein Decl. ¶ 21(b)-(d). The family also declined to install a Hoyer lift, which the agency said was necessary for staff safety. *See* Bernstein Decl. ¶ 21(a). Additionally, the family has turned down nurses.

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO.  3:26-CV-05095-TMC

16

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
360-586-6565

*See* Bernstein Decl. ¶ 21, Ex. 3 at 1. In light of these circumstances, HCA has complied with the "test of reasonableness."

### (2)    Plaintiff W.M.

The plaintiffs assert that W.M. has been approved for 372 hours of PDN per month, has not received any services since January 2025, receives 180 hours per month of personal care as a replacement for PDN, and is at risk of institutionalization. *See* Dkt. #18 at p. 4:12-17, 4:20-22, 11:9-13, 13:17-20.

W.M. is enrolled with Molina Healthcare of Washington, Inc. ("Molina"), an MCO contracted with HCA. *See* Jones Decl. ¶¶ 5, 12. W.M. also receives "health home" benefits, which involves care coordination. *See* Jones Decl. ¶¶ 18-19; Birch Decl. ¶ 14; Elane Decl. ¶ 34.

Although his family claims he was institutionalized for the first years of his life because of lack of PDN, W.M.'s family did not discuss PDN with Molina until February 2024. *See* Elane Decl. ¶ 36. Molina and W.M.'s providers then worked with the family to coordinate W.M.'s discharge home in September 2024. *See* Elane Decl. ¶¶ 37-48. Molina ultimately approved W.M. for 8 hours of PDN per day on October 30, 2024, which later increased to 12 hours per day. *See* Elane Decl. ¶¶ 55-56, 64.

Because W.M. is eligible for PDN, he is not eligible for personal care under DSHS's rules. *See* Birch Decl. ¶ 15. However, at his mother's request, DSHS approved W.M. for 360 hours of nurse delegable personal care per month under an "exception to rule" ("ETR") to replace unused PDN hours. *See* Birch Decl. ¶¶ 15-17. CDWA is the provider, and W.M. has had the same IP for over a year. *See* Birch Decl. ¶¶ 17, 19; Declaration of De'Shanel Childs dated March 19, 2026 ("Childs Decl."), ¶ 9. CDWA has previously approved overtime hours for W.M.'s IP. *See* Birch Decl. ¶ 19.

W.M.'s family has never indicated to the DSHS case manager any issues with locating IPs and has expressed satisfaction with W.M.'s services. *See* Birch Decl. ¶ 20. DSHS and W.M.'s nurse delegator are encouraging the family to secure a second IP by making referrals, but the

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO.  3:26-CV-05095-TMC

17

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
360-586-6565

family must be willing. *See* Birch Decl. ¶¶ 20, 21, 23-24, Ex. 2 at 23, 26. W.M.'s family insists that any in-home providers meet qualifications above those already required by state law (such as at least 10 years of nursing experience). *See* Birch Decl. ¶ 24, Ex. 3.

Over the past year, W.M.'s family has expressed a preference for personal care and has shown little interest in PDN. *See* Elane Decl. ¶¶ 69, 74, 80. It was not until February 23, 2026, that W.M.'s mother told DSHS and Molina that she was willing to look for PDN providers. *See* Birch Decl. ¶ 24; Elane Decl. ¶ 81.

Based on the "test of reasonableness," HCA and its partners at DSHS and Molina have provided services to W.M. with reasonable promptness. The State has worked closely and continuously with the family, and the request for PDN was renewed less than a month ago. *See* Elane Decl. ¶¶ 81-82. The State cannot compel the family to accept any provider, and while the family has the right to insist upon qualifications, those are beyond the State's control.

### (3)    Plaintiff O.S.

The plaintiffs assert that O.S. has been approved for 248 hours per month of PDN and 232 hours of personal care per month, has been able to use about 50% of those hours, and is at risk of institutionalization. *See* Dkt. #18 at p. 5:4-6, 5:8-9, 11:13-15, 13:17-20.

O.S. is enrolled with Molina. *See* Jones Decl. ¶ 12; Elane Decl. ¶ 15. O.S. receives PDN through Molina and has been consistently served by the same agency with fluctuating hours. *See* Elane Decl. ¶¶ 16, 22. O.S.'s mother declined Molina case management but receives informal care coordination. *See* Elane Decl. ¶¶ 10, 11, 16, 22, 28.

DSHS granted the family's ETR request to allow O.S. to receive personal care because PDN hours were not always available. *See* Donald Decl. ¶¶ 6-10. Some of O.S.'s personal care tasks are nurse delegable. *See* Donald Decl. ¶ 11. CDWA is the provider. *See* Donald Decl. ¶¶ 8-10. O.S. currently has three IPs, two of whom are family members, and formerly had four IPs. *See* Childs Decl. ¶ 4. O.S.'s mother has not returned two November 2025 calls from CDWA regarding potential assistance. *See* Childs Decl. ¶ 5.

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO.  3:26-CV-05095-TMC

18

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
360-586-6565

On January 29, 2026, O.S.'s mother asked Molina for assistance with locating additional nursing, and Molina sent out referrals. *See* Elane Decl. ¶ 26. O.S.'s mother has now been contacted by many agencies. *See* Elane Decl. ¶¶ 28, 30. She expressed a preference to stick with one provider and interview nurses through her current agency. *See* Elane Decl. ¶ 30. She specified that she did not need anything else from Molina. *Id.*

Under the "test of reasonableness," HCA is providing services to O.S. with reasonable promptness. Molina responded when O.S. asked for help finding nurses. O.S.'s family is setting the pace for arrangement of services and has said they need nothing more from Molina. The State has worked promptly at all times with the family to ensure the availability of personal care, including the use of an ETR.

### (4)    Plaintiff J.P.

The plaintiffs assert that J.P. has been approved for 73 hours of personal care per month, has been unable to fill any hours since 2020, and is at risk of institutionalization. *See* Dkt. #18 at p. 5:14-17; 12:9-11. The allegations do not pertain to PDN services.

Although his mother claims he has not received personal care since 2020 (Dkt. #12), J.P. received personal care from an IP from 2020 until 2023. *See* Childs Decl. ¶ 7; Moore Decl. ¶ 3; Welker Decl. ¶¶ 5-6. Since then, DSHS assisted J.P.'s mother when she asked about finding a new caregiver. A contractor of DSHS was able to identify a potential caregiver in April 2025, but his mother did not return communications from DSHS and the agency. *See* Welker Decl. ¶¶ 19-21. Additional outreach occurred in October and November 2025, and DSHS is awaiting a response. *See* Hegr Decl. ¶¶ 6, 7, Ex. 4. As of February 16, 2026, CDWA issued a notice that J.P.'s newly selected IP may begin providing services. *See* Childs Decl. ¶ 6.

The State has met the "test of reasonableness" in providing services to J.P. and working with the family to find a new caregiver. The family has not responded to recent DSHS inquiries, and the State cannot force the family to accept any provider. As of last month, he has a new IP ready to provide services.

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO.  3:26-CV-05095-TMC

19

**(5)     Plaintiff W.J.**

The plaintiffs assert that W.J. has been approved for 28 hours of personal care per month, has been unable to fill any hours since July 2025, and is at risk of institutionalization. *See* Dkt. #18 at p. 5:21-24; 12:11-12. The allegations do not pertain to PDN services.

W.J. was first determined eligible for personal care in June 2021, but the eligibility terminated in August 2022 when the family did not participate in the annual assessment and stated they did not mind the termination. *See* Birch Decl. ¶ 7. Eligibility for personal care resumed in February 2025. *See* Birch Decl. ¶ 8. CDWA is the provider. *See* Birch Decl. ¶ 11.

In June 2025, W.J.'s family reported that his services were going well and that he had no unmet needs. *See* Birch Decl. ¶ 9. Contrary to his mother's declaration (Dkt. #21), W.J. received personal care through September 2025. *See* Childs Decl. ¶ 8.

The State has met the "test of reasonableness" for W.J., especially since the family has reported satisfaction with services and has not reported any unmet needs. Personal care is a "person-centered" program, and clients have the right to decline services. *See* Randles Decl. ¶ 32. The State cannot force services upon a client who does not pursue them. *Id.*

**4.      The plaintiffs are not likely to prevail on their ADA and Rehabilitation Act claims**

The plaintiffs have not established that they are likely to prevail on their claim that HCA is violating the ADA or Section 504 of the Rehabilitation Act. The plaintiffs assert they are at "serious risk of institutionalization" because HCA is violating the "integration mandate" of the statutes. *See* Dkt. #18 at p. 3:8-11, 15:9-10.

Public entities must "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." *See* 28 C.F.R. § 35.130(d). Public entities must "provide care in integrated environments for as many disabled persons as is reasonably feasible." *Arc. of Wash. State, Inc. v. Braddock*, 427 F.3d 615, 618 (9th Cir. 2005).

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO. 3:26-CV-05095-TMC

20

The plaintiffs must establish that (1) they are qualified individuals with a disability; (2) they were excluded from participating in, or were denied the benefits of, the state's services, programs, or activities or were otherwise discriminated against by the state; and (3) the exclusion, denial, or discrimination was because of their disability. *See* 42 U.S.C. § 12132; *Townsend v. Quasim*, 328 F.3d. 511, 516 (9th Cir. 2003).

A public entity's responsibility "is not boundless" once it does provide community-based services to qualified individuals. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 603-04 (1999); *see also Sanchez v. Johnson*, 416 F.3d 1051, 1063 (9th Cir. 2005). States must have "leeway" in administering their programs. *Olmstead*, 527 U.S. at 605; *Arc of Wash.*, 427 F.3d at 618. States have "competing policy and fiscal considerations[.]" *Sanchez*, 416 F.3d at 1063 (citing Justice Ginsburg's plurality opinion in *Olmstead*, 527 U.S. at 603). States must sometimes make "reasonable modifications in policies, practices, or procedures[.]" *See* 28 C.F.R. § 35.130(b)(7)(i). But modifications that would "fundamentally alter the nature of the service, program, or activity" are not necessary. *Id.*; *see also Sanchez*, 416 F.3d at 1063.

In addition, courts give significant deference to public entities in the equitable allocation of available resources, given the need to care for a large and diverse disabled population. *Olmstead*, 527 U.S. at 603-04. An entity does not violate the integration mandate if community placement cannot be reasonably accommodated after taking into account available resources and the needs of others with disabilities. *Id.*

As explained below, the plaintiffs are not likely to prevail because (1) they have not shown they have been denied Medicaid benefits or are at serious risk of institutionalization and (2) their requested relief would require fundamental alterations to the program.

### a.   The plaintiffs have not proven a serious risk of institutionalization

With scant evidence, the plaintiffs assert they are at "a serious risk of institutionalization." *See* Dkt. #18 at p. 3:8-11. Their evidence pertains only to the plaintiffs receiving PDN, not to those receiving personal care.

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO.  3:26-CV-05095-TMC

21

Courts have found a serious risk of institutionalization when (1) a state has policies or procedures or takes an action that causes a serious risk of institutionalization and (2) plaintiffs show that, as a result, they are at serious risk of institutionalization. *See, e.g.*, *M.R. v. Dreyfus*, 697 F.3d 706 (9th Cir. 2012); *V.L. v. Wagner*, 669 F. Supp. 2d 1106, 1119 (N.D. Cal. 2009); *Ball v. Rodgers*, No. CV 00-67-TUC-EHC, 2009 WL 1395423, at *4 (D. Ariz. April 24, 2009) (unpublished); *Ball v. Biedess*, No. CIV00-0067-TUC-EHC, 2004 WL 2566262, at *2-3 (D. Ariz. Aug. 13, 2004) (unpublished).

The plaintiffs have not alleged or proven that the State has any policies or procedures that are causing a serious risk of institutionalization. Also, the plaintiffs claim the State has conceded they are at risk of institutionalization because, to determine eligibility for personal care, the State analyzes whether a client needs an "institutional level of care." *See* Dkt. #18 at p. 12:1-7. The fact that a client meets the criteria for institutional level of care does not mean the client is at risk of institutionalization; those are two different considerations.

Furthermore, the facts here differ from cases where courts found a risk of institutionalization. The plaintiffs rely on *Indiana Protection and Advocacy Services Commission v. Indiana Family and Social Services Admin.*, 149 F.4th 917 (7th Cir. 2025). *See* Dkt. #18 at p. 12:13-13:15. In that case, the state was attempting to terminate a policy under which it paid parents for providing in-home care. *Indiana Protection*, 149 F.4th at 920. This would have put the children at risk of institutionalization. *Indiana Protection*, 149 F.4th at 930. Here, HCA is not engaging in any such action, and as explained above, is providing in-home services and working with the families to obtain additional care. C.F. and W.J.'s families are selective about nurses. *See* Bernstein Decl. ¶ 21(d); Birch Decl. ¶ 24. O.S. and W.J.'s families only recently renewed requests for additional nurses, which Molina is working to accommodate. *See* Elane Decl. ¶¶ 30, 82. HCA cannot compel the families to accept any provider.

For the plaintiffs receiving personal care but not PDN, the plaintiffs offer only statements from the families, not from medical professionals. *See* Dkt. #18 at p. 5:17-18 (J.P.), 6:1-2 (W.J.).

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO. 3:26-CV-05095-TMC

22

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
360-586-6565

This is insufficient to conclude a serious risk of institutionalization exists. Personal care involves assistance with ADLs, which for J.P. and W.J., are not medical tasks. *See* Birch Decl. ¶ 6; Welker Decl. ¶ 5. A claim that there is a "risk of institutionalization" but for the provision of personal care ignores the informal supports they receive from their parents. *See* Randles Decl. ¶ 12. Furthermore, J.P. and W.J. have not shown that they lack caregivers due to a state policy.

**b.    The plaintiffs' requested relief would require a fundamental alteration of the Medicaid program**

The plaintiffs' proposed remedy of requiring the State to pay parents to provide PDN and personal care to their children would fundamentally alter the program, including the need to obtain approval from the Legislature and CMS.

A state is not required to grant modifications if they would fundamentally alter the nature of a program, when taking into account the cost, available resources, the range of services the state provides, and the state's obligation to offer services equitably. *Olmstead*, 527 U.S. at 597. The state is required only to make reasonable changes in policies to accommodate individuals' disabilities. *Townsend*, 328 F.3d at 518. The plaintiffs must prove their proposed modifications are reasonable. *Olmstead*, 527 U.S. at 607.

In addition, a state "must have sufficient leeway '[t]o maintain a range of facilities and to administer services with an even hand[.]'" *Sanchez*, 416 F.3d at 1067 (citing *Olmstead*, 527 U.S. at 605). "[C]ourts should be sympathetic to fundamental alteration defenses against proposed modifications to state services and programs for care of the disabled." *Id.* A state may avoid modifying its programs if it can demonstrate that it has a "comprehensive, effectively working plan" for deinstitutionalization. *Olmstead*, 527 U.S. at 605-06.

The State does not allow CDWA to hire parents as IPs for providing in-home care to their children. *See* Wash. Admin. Code § 388-115-0540(1)(b) (2024); Randles Decl. ¶ 31, Ex. 1. The Legislature recently reaffirmed this policy by declining to enact bills in 2025 and 2026 that

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO.  3:26-CV-05095-TMC

23

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
360-586-6565

would have allowed such payments. *See* Substitute House Bill 1200.[6] The Court should defer to the Legislature's decisions about the equitable allocation of available resources. *Olmstead*, 527 U.S. at 603-04; *Sanchez*, 416 F.3d at 1067.

Further, Plaintiffs' request would not require parents to meet any of the state standards for providing nursing or personal care, such as proper credentials and background checks. *See* Randles Decl. ¶ 17. CMS will not allow federal funding unless necessary safeguards are in place. *See* 42 C.F.R. § 441.570. An order requiring HCA to pay parents, in the absence of CMS approval, could significantly increase the State's budget for such services.

The State has an effective deinstitutionalization plan and should be allowed to operate its programs without fundamental alteration. *See* Declaration of Rachelle Ames dated March 16, 2026, ¶ 2, Ex. 1.

## C.     The Plaintiffs Are Not Likely to Suffer Irreparable Harm

The plaintiffs have not established they are likely to suffer irreparable harm in the absence of a preliminary injunction. The plaintiffs generally assert a lack of PDN or personal care services and a risk of institutionalization.

Speculation about potential harm is insufficient; the plaintiffs must demonstrate that irreparable injury is likely without an injunction. *Winter*, 555 U.S. at 7. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

For the plaintiffs receiving personal care but not PDN, the Motion offers only speculation about imminent harm. *See* Dkt. #18 at p. 5:17-18 (J.P.), 6:1-2 (W.J.). Plaintiffs have IPs or have made little effort to obtain IPs. *See generally* Welker Decl.; Birch Decl.; Childs Decl. There is no "clear showing" of the harm of institutionalization. *Winter*, 555 U.S. at 22.

///

---

[6] *See* HB 1200 Washington State Legislature (last visited March 16, 2026).

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO.  3:26-CV-05095-TMC

24

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
360-586-6565

For the plaintiffs receiving PDN, the evidence shows the State has taken steps to alleviate occasional shortages by offering ETRs to allow personal care when appropriate. *See* Birch Decl. ¶ 17; Donald Decl. ¶ 10. Gaps in hours are often due to roadblocks with the families or because of preference for certain caregivers, not due to the fault of the State. *See generally* Elane Decl.; Bernstein Decl.; Welker Decl.

In addition, there is no evidence that an order to pay parents for providing care to their children would head off any possibility of institutionalization. The parents presumably would continue to care for their children, which they currently do without pay. If the children are now at risk of institutionalization, paying the parents would have no effect. The plaintiffs are speculating and have not made "a clear showing" of entitlement to this relief. *Winter*, 555 U.S. at 22.

**D.    The Balance of Equities and the Public Interest Both Tip Toward the State**

The plaintiffs have not established that the balance of equities and the public interest tip in their favor. These two factors "merge where a government agency is a party." *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024).

The Court must (1) "balance the competing claims of injury"; (2) "consider the effect on each party of the granting or withholding of the requested relief"; and (3) consider "the public interest implicated by an injunction." *Arc of California v. Douglas*, 757 F.3d 975, 991 (9th Cir. 2014) (quotation and citation omitted). The Court should exercise caution in "second-guess[ing] the political branches' wisdom in deciding how to balance" policy considerations. *San Carlos Apache Tribe v. U.S. Forest Service*, 803 F.Supp.3d 879, 956 (D. Ariz. 2025).

The State has taken considerable steps to provide services to the plaintiffs and assist the families in finding additional caregivers. *See generally*, Elane Decl.; Bernstein Decl.; Birch Decl. A mandatory injunction would not change the salient facts. Payment to parents will not incentive them to search for caregivers. The public interest would be best served by continuing to allow

///

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO.  3:26-CV-05095-TMC

25

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
360-586-6565

the Legislature to weigh the policy choices and to allow HCA to continue working with the families to provide services.

Furthermore, it is not in the public interest to compel HCA to submit a State Plan Amendment at the injunction stage. *Nat'l Ass'n of Chain Drug Stores v. Schwarzenegger*, 376 Fed. Appx. 674, 675 (9th Cir. 2010).

## V.    CONCLUSION

For the reasons outlined above, HCA asks the Court to deny the Motion.

I certify that this memorandum contains 8,378 words, in compliance with the Local Civil Rules.

RESPECTFULLY SUBMITTED this 20th day of March. 2026.

NICHOLAS W. BROWN
Attorney General


*s/Nissa Iversen*
NISSA IVERSEN, WSBA No. 46708
Assistant Attorney General
WILLIAM T. STEPHENS, WSBA No. 24254
Senior Counsel

Office of the Attorney General
7141 Cleanwater Drive SW
PO Box 40124
Olympia, WA  98504-0124
Telephone: (360) 586-6565
E-mail:        nissa.iversen@atg.wa.gov
               bill.stephens@atg.wa.gov

*Attorneys for Defendant Ryan Moran*

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO.  3:26-CV-05095-TMC

26

# CERTIFICATE OF SERVICE

I certify that on the date indicated below, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants:

Gregory Albert, WSBA #42673
3131 Western Ave., Suite 410
Seattle, WA 98121
Telephone:  (206)-576-8044
Email: greg@albertlawpllc.com
*Attorney for Plaintiffs*

Robert H. Farley, Jr., Ltd.
Robert H. Farley Jr.
1155 S. Washington Street
Naperville, IL 60540
Telephone: (630) 369-0103
E-mail: farleylaw@aol.com
*Attorney for Plaintiffs*

I certify under the penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

EXECUTED this 20th day of March, 2026, at Olympia, Washington.

*s/Nissa Iversen*
Nissa Iversen, AAG

RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION --
NO.  3:26-CV-05095-TMC

27

ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW
PO Box 40124
Olympia, WA 98504-0124
360-586-6565

Exhibit A

